STATE BOARD OF MEDICAL REGISTRATION AND EXAMINATION v. SCHERER.

[No. 27,758.   Filed February 15, 1943.]

*George N. Beamer,* Attorney General, *C. Ballard Harrison,* Deputy Attorney General, *Roland Griffin,* of Sheridan, *Sherwood Blue* and *Jesse W. Gammon,* both

of Indianapolis (*Albert Stump*, of Indianapolis, of counsel), for appellant.

*Oscar F. Smith*, of Indianapolis (*Cloe & Campbell*, of Noblesville, of counsel), for appellee.

FANSLER, J.—A proceeding was commenced against the appellee before the State Board of Medical Registration and Examination for the revocation of his license to practice naturopathy or drugless medicine because of gross immorality. The board entered an order revoking his license. The appellee took a so-called appeal to the Circuit Court of Marion County. The venue was changed to the Hamilton Circuit Court, where the cause was tried by the court without a jury, and there was a judgment for the appellee.

Numerous errors are assigned, but we need consider only the assignment which questions the sufficiency of the evidence.

Section 63-1306, Burns' 1933, § 10707, Baldwin's 1934, provides that the State Board of Medical Registration and Examination shall establish "a schedule of the minimum requirements which must be complied with by applicants for examination for license to practice medicine, surgery and obstetrics before they shall be entitled to receive such license"; that it shall also establish "a schedule of the minimum requirements and rules for the recognition of medical colleges, so as to keep these requirements up to the average standard of medical education in other states." There are provisions for issuing licenses to graduates of standard medical schools, and that otherwise licenses shall not be issued until the applicant "shall have passed before said board a satisfactory examination as to his qualifications to practice medicine, surgery and obstetrics"; that the board shall have the right to review the evi-

dence upon which a license has been obtained, and that if it shall be found that it was obtained by fraud or misrepresentation, the board may revoke such license. "The board may refuse to grant a certificate to any person guilty of felony or gross immorality, or addicted to the use of liquor or drug habit to such a degree as to render him unfit to practice medicine or surgery. If any person holding a license under the provisions of this act shall be guilty of any of the above enumerated acts or shall have procured a certificate or license by fraud or misrepresentation, said board may, after notice and hearing, revoke any license which has heretofore been or may hereafter be issued to him. . . ." It is provided that if the board shall refuse to grant a license or shall revoke a license, an appeal may be taken to the circuit or superior court; that the verified charges, in case of revocation, shall be treated as a complaint; that: "The accused may plead to said charges and issues may be formed thereon as in any civil case, and the same shall thereupon be tried by the judge of the circuit court. It shall be the duty of the prosecuting attorney of the circuit to which said county belongs to appear in such case and represent the board. The only finding and judgment in such cases shall be 'guilty' or 'not guilty,' the same to be rendered separately as to each of the charges." There is provision for appeal from the judgment to this court.

Section 63-1312, Burns' 1933, § 10713, Baldwin's 1934, enacted in 1927, provides that: "All persons who are now practicing or may hereafter engage in the practice of chiropractic or any other method or system of healing in this state shall be subject in all respects . . ." to the provisions of the act "except that applicants for license to practice chiropractic or any other system or method of healing in which drugs are not administered

and which does not include surgery or obstetrics shall not be required to take an examination in materia medica, surgery and obstetrics." It is provided further that any one practicing such a method of healing before January 1, 1927, who is a graduate of a school or college teaching the system which he practices, shall be entitled to a license.

The granting and revocation of licenses to engage in trades, businesses, or professions is a ministerial function. Ministerial boards act as fact-finding bodies to ascertain whether applicants conform to a legislative formula by which the right to a license is fixed. It is well settled that under the division of powers, these ministerial fact-finding duties may not be delegated to courts, and that the so-called appeal provisions of statutes which undertake to vest in courts jurisdiction to try and determine *de novo* the facts entitling an applicant to a license, or to continue to operate under a license, must be treated as merely providing procedure by which the proceeding may be brought before the court for an investigation to determine whether the ministerial body has acted legally and within its powers. In all of such cases, if the ministerial board has conformed to statutory procedural methods, and its decision is supported by substantial evidence, its findings and determination will not be disturbed. *Spurgeon et al.* v. *Rhodes* (1906), 167 Ind. 1, 78 N. E. 228; *Stone, Superintendent* v. *Fritts* (1907), 169 Ind. 361, 82 N. E. 792; *In re Northwestern Indiana Telephone Company et al.* (1930), 201 Ind. 667, 171 N. E. 65; *Lloyd et al.* v. *City of Gary* (1938), 214 Ind. 700, 17 N. E. (2d) 836. It is true that the statute here in question seems to contemplate a *de novo* proceeding before the court, and a finding of "guilty" or "not guilty," but, regardless of what may seem a legislative

intention to the contrary, this court has consistently construed similar statutes as vesting in the courts only such jurisdiction as the Constitution permits. In cases of applicants for a license to practice medicine, surgery, or obstetrics, who have not obtained a diploma from a licensed school, the board examines the applicant in *materia medica*, surgery, and obstetrics. The impropriety of courts reexamining applicants in such subjects, and, in case of conflicting evidence as to qualifications, substituting its judgment for that of the board, is obvious. It is clear that courts cannot decide for themselves the cases in which they will assume jurisdiction to weigh evidence as to qualifications and those in which they will not. The jurisdictional queston involves basic constitutional considerations.

The appellee was licensed to practice naturopathy. Webster defines naturopathy as: "A system of physical culture and drugless treatment of disease by methods supposed to simulate or assist nature." Webster's New International Dictionary, Second Edition. In advertising he circulated a book describing himself as: "Successor to C. R. Perdue, M. D., Dermatologist and Plastic Surgeon," and as: "A physician of wide experience and well qualified to administer any form of treatment which may be needed"; that among other degrees he had a degree of "Doctor of Medicine." These statements were likely to give the impression that the appellee was a doctor of medicine, a dermatologist, and a plastic surgeon, and that he was qualified to treat medically or surgically, and they justify the conclusion that they were so intended. One of the witnesses, who also testified before the State Board of Medical Registration and Examination, said: "I just saw his name in the telephone directory and that he

was successor to Dr. PerDue and I had understood that Dr. PerDue was a good doctor and I just went to him." Although licensed only as a drugless practitioner, he prescribed pills, salves, and other medicines, which he referred to as "herbal tea." He testified: "When issued that particular herbal tea is not that color and does not have the drugs in it as when I issued it." He testified as to certain examinations of one patient after the "medicine" had been taken. He said that he limited his practice to "naturopathic" remedies as taught in those schools, and that: "Naturopathic schools teach the use of digitalis." He testified that he had received the degree of Doctor of Homeopathic Medicine, but had made no inquiry from the State Board of Medical Registration and Examination as to whether that school is recognized and accredited; that he had never attempted to be licensed as a physician and surgeon; but he nevertheless advertised himself an M. D.

He used a machine which he called a "hemovitameter." He said: "The interior of a hemovitameter is just a lot of wires and different circuits to different contacts and connections. There is at least one radio tube in it. There are a number of resistance coils." A witness testified that he examined her with this machine; that he gave her a piece of metal to hold in her hand, which was plugged into a light socket with a cord; that he worked little dials like on a radio; that there was a little vial which had liquid in it and bounced back and forth. After examination by this machine he told her that she had cancer, an acid condition, and a catarrhal condition, and a number of other things, but he said: "I will have to say this to you—you don't use tobacco and you don't use intoxicants, you haven't any syphilis in your system." He told her that if she would take the medicine he gave her and stay on a diet

he could cure her "sound and well." He testified that the machine worked much like a radio; that you make contact with a little fibroid plate under which there are two coils in which the magnetism is built up to the point it causes the fingers to stick lightly to that plate; that then by measuring the amount you can turn another dial which tunes in to that same circuit a ·blocking condenser until that magnetism is completely blocked out; that by that means the dials are read as being the intensity of the disease of the patient's body for that particular setting; that the detection of magnetism with his fingers is by means of a traction through the plate to the coils underneath. He went on to say that he rubbed the plate lightly, and that it takes a lot. of practice to operate the machine efficiently.

An engineer testified that only mechanical vibrations can be detected by hand; that the frequencies would be very low, lower than the sounds we hear; that there are no electric vibrations that are detectable as such by the human hand except voltage in which a shock is found, and that there would have to be a wide variation in vibrations to be detectable by touch; that: "It is impossible to build any machine dealing in frequencies or vibrations that will pick up vibrations regardless of their source that does not fall within the known spectrum from zero to three hundred million cycles per second. All those frequencies can be detected and measured with regular equipment. They can not be detected by the human hand outside of those frequencies which cause burns, or light, or other physical manifestations observable to sight. It is absolutely impossible for the human hand to detect magnetism in any form simply because basically and fundamentally magnetism has no effect except on a very few metals and minerals." The machine seems for all practical purposes to be the

same as the one involved in *Crum* v. *State Board of Medical Registration and Examination* (1941), 219 Ind. 191, 37 N. E. (2d) 65.

The evidence above referred to is undisputed. Much of it was given in the hearing before the state board. It conclusively shows that the appellee was posing as an M. D., without a license; that he was advertising in a manner calculated to lead the unsuspecting to believe that he was licensed to practice medicine and surgery. It is most difficult to avoid the conclusion that he was prescribing drugs and medicines. In his own testimony he referred to one of his prescriptions as containing drugs. Making due allowances for the wonders of scientific accomplishment, it seems inconceivable that by the use of his machine on a first visit of a patient he could ascertain that she was not addicted to the use of liquor or tobacco, that she had catarrh and a cancer of the colon, and yet it is not denied that he so advised the witness who testified. Misrepresenting himself as entitled to practice medicine, the prescribing of drugs and medicines not permitted by his license, and misrepresentation of the powers of his machine to credulous and unsuspecting sufferers who put themselves in his hands, assuming from his being permitted to practice that he was skilled in diagnosis and treatment of diseases, was, of course, grossly immoral. *Indiana Board of Pharmacy* v. *Haag* (1916), 184 Ind. 333, 111 N. E. 178; *Spurgeon et al.* v. *Rhodes, supra; Crum* v. *State Board of Medical Registration and Examination, supra.* There is no substantial conflict in the evidence in respect to these matters, and even though the court had jurisdiction to try the case *de novo* and weigh the evidence, it is clear that a wrong result was reached. We have concluded, however, that the only jurisdiction of the court was to review the decision of the board,

and that the decision of the board must be sustained if it was supported by substantial evidence, which it clearly was.

Judgment reversed, with instructions to enter an order sustaining the order of the board revoking appellee's license.

O'Malley, J., not participating.

NOTE.—Reported in 46 N. E. (2d) 602.